MATRKA, Appellant,

v.

DELTA AIRLINES, INC., Appellee.

[Cite as *Matrka v. Delta Airlines, Inc.* (1997), 116 Ohio App.3d 678.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APE03–420.

Decided Sept. 30, 1997.

*Marcell Rose Anthony,* for appellant.

*Brown, Bartunek & Worthing* and *Thomas C. Brown,* for appellee.

PEGGY BRYANT, Judge.

Plaintiff-appellant, Paul Matrka, appeals from a judgment of the Franklin County Court of Common Pleas (1) granting the summary judgment motion of defendant-appellee, Delta Airlines, Inc. ("Delta") and (2) denying plaintiff's motion for partial summary judgment.

On October 28, 1994, plaintiff purchased a Rolex watch for $12,539.31 as a gift for an Orlando, Florida resident. Plaintiff took the watch in an unmarked package to Port Columbus International Airport, where he paid Delta $52.06 to ship the package to Orlando via Delta Dash, Delta's small package delivery service. Plaintiff had never before used the delivery service.

Plaintiff completed an air waybill for the package, described the contents as a "watch," and signed his name in the signature block. Plaintiff did not declare a value for the watch in the waybill's declared value block. The declared value block is located in the middle of the waybill and refers the reader to the reverse side of the document. The reverse side, entitled "CONDITIONS OF CON-TRACT," contains eleven numerated paragraphs, which state in pertinent part:

"1. Declared Value and Liability Limits—Declared Value is agreed and understood to be $50.00 per package unless a higher value, not to exceed $750.00 per package domestically and $1250.00 internationally, is requested by the customer and entered in the Declared Value block on the reverse side of this air waybill. Maximum carriers liability is the average declared value per package or the damages sustained, whichever is lesser.

" * * *

"3. Carrier Tariffs Govern—It is mutually agreed that the shipment described herein is accepted on the date hereof in apparent good order (except as noted) for carriage as specified herein, subject to governing tariffs in effect as of the date hereof. Said tariffs are available for inspection by the parties hereto and are hereby incorporated into and made part of this contract.

" * * *

"6. Consequential and Special Damages—The Carrier shall not be liable for any consequential or special damages whether or not the Carrier had knowledge that such damages might be incurred.

" * * *

"9. Insurance Covering Carrier—Delta is a self-insurer up to $5,000.00 with respect to the risk of loss, damage, or delay and maintains sufficient liability insurance above the self-insured amount to cover any foreseeable contingency for which Delta is liable.

"10. Georgia Law Applicable—This agreement shall be interpreted and enforced according to the laws of the State of Georgia."

Plaintiff estimates that the transaction at the Delta counter was completed within fifteen minutes, during which time plaintiff glanced over the air waybill provisions and concluded that paragraph nine protected him should the watch be lost or damaged during shipment. Although plaintiff told Gerry Thompson, the Delta employee who processed the transaction, that the watch was "extremely" valuable, Thompson did not request a specific valuation nor did he explain that the Delta Dash service was available only for shipments valued at or less than $750. Moreover, plaintiff was never told that Delta operates Delta Air Cargo, which allows shippers to insure packages valued in excess of $750.

The packaged watch was loaded on a Delta airplane for shipment to Atlanta and then to Orlando; it was lost during shipment and has not been located. Plaintiff filed a claim with Delta for the full value of the watch, but Delta refused the claim and instead sent plaintiff a check for $102.56, representing the $50 minimum declared value plus the $52.06 shipping fee paid by plaintiff.

Through a complaint filed April 14, 1995, and two subsequent amended complaints, plaintiff alleged defendant's noncompliance with federal common law, negligence, and conversion; plaintiff sought actual, consequential, and punitive damages. Plaintiff alternatively sought rescission or declaratory judgment.

On January 17, 1996, plaintiff filed a motion for partial summary judgment for the full value of the watch. On January 19, 1996, defendant responded with its own motion for summary judgment. Applying Georgia statutory law, the trial court concluded that defendant was liable for losing the watch, but a factual issue existed on the extent of damages plaintiff could recover. Accordingly, the trial court denied both motions.

On December 9, 1996, both parties jointly moved the trial court to reconsider their respective summary judgment motions. The parties stipulated to the facts set forth in the trial court's first decision and agreed the case was governed by federal common law. The trial court granted the parties' motion for reconsideration; it thereafter granted defendant's summary judgment motion, and denied

plaintiff's motion for partial summary judgment. Plaintiff timely appeals, assigning the following errors:

"I. The trial court erred in granting appellee's motion for summary judgment.

"II. The trial court erred by not granting appellant's motion for partial summary judgment based upon federal common law.

"III. The trial court denied due process and equal protection and jury trial in violation of the United States and Ohio Constitutions by terminating the case because plaintiff–appellant had other causes of action for conversion and negligence."

Because plaintiff's first and second assignments of error are interrelated, we address them jointly. In accordance with Civ.R. 56, the evidence must be construed most strongly in favor of the nonmoving party; summary judgment should be granted only if no genuine issue of fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. A motion for summary judgment first forces the moving party to inform the court of the basis of the motion and to identify portions in the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 296, 662 N.E.2d 264, 275–276. If the moving party makes that showing, the nonmoving party then must produce evidence on any issue for which the party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus (*Celotex v. Catrett* [1986], 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, approved and followed). Due to the stipulated facts in this case, however, plaintiff's appeal presents issues of law. Accordingly, we must determine whether the trial court's judgment is in accordance with law.

Preliminarily, we must determine whether this case is governed by federal or state law. Although the parties recognized and agreed in the trial court that federal common law governs the enforceability-of-liability limitation provisions in air waybills, the trial court found no preemption and applied Georgia state law pursuant to the waybill's choice of law provision.

■ Federal law, not state law, governs the ability of an air carrier to limit its liability for loss of goods during shipment. See, *e.g.*, *First Pennsylvania Bank v. E. Airlines, Inc.* (C.A.3, 1984), 731 F.2d 1113, 1115. Further, "deregulation has not changed either the applicability of federal law or its substantive content." *Id.* at 1122; see, also, *U.S. Gold Corp. v. Fed. Express Corp.* (S.D.N.Y.1989), 719 F.Supp. 1217, 1223–1224 (a post-deregulation case balancing the state and federal interests affected by national air cargo carriage and concluding that the need for

uniform standards validates the continued application of federal law). Indeed, as defendant notes, the Airline Deregulation Act of 1978 ("ADA") supports applying federal law to this case, providing:

"[A] State * * * may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." Section 41713(b)(1), Title 49, U.S. Code; see, also, *Trujillo v. Am. Airlines, Inc.* (N.D.Tex.1995), 938 F.Supp. 392, 394, affirmed without opinion (C.A.5, 1996), 98 F.3d 1338 (because preparation of waybills and the shipment of packages are "services" within the meaning of Section 41713(b)(1), the shipper's state law negligence and unfair trade practice claims were preempted and his remedy was limited to a contract claim that was governed by federal common law). Accordingly, federal common law governs the enforceability of the liability limitation provisions at issue.

Moreover, even if we apply the choice of law provision in the waybill, the result is the same. Federal law would control, as Georgia common law correctly recognizes that federal, not state, law governs these cases. See, *e.g., Burlington Air Express v. Georgia Pacific Corp.* (1993), 211 Ga.App. 113, 438 S.E.2d 97, 98, certiorari denied ―― U.S. ――, 116 S.Ct. 520, 133 L.Ed.2d 427 ("since deregulation, federal law continues to govern the enforceability of limitation provisions in airbills"). Here, the parties recognized and agreed that federal common law governs this case, a stipulation supported under the relevant case law.

█ Federal common law applies the "released value doctrine" to determine whether an air carrier may limit its common carrier liability for loss of goods in its care. The released value doctrine provides that a carrier may limit its liability to the agreed value of the goods if "the shipper has the option of obtaining coverage for the full value of its goods, is made aware of that option, and knowingly chooses to pay a lower price for lesser coverage." *First Pennsylvania Bank, supra,* 731 F.2d at 1122.

█ Liability limitation provisions are permitted because they have certain advantages. They allow an air carrier to avoid unforeseeably high liability for especially valuable cargo, and they permit shippers of ordinary items to pay lower rates. At the same time, they permit shippers of valuable cargo to choose between purchasing insurance directly from the carrier, or obtaining perhaps less expensive insurance from an independent source. *Hill Constr. Corp. v. Am. Airlines, Inc.* (C.A.1, 1993), 996 F.2d 1315, 1317. However, liability limitation provisions risk unfairness if shippers are unaware of the limitation and their options. Federal common law balances the advantages and risks associated with such provisions by requiring "reasonably communicative notice and an opportuni-

ty to buy increased coverage." *Id.* at 1317. If the carrier fails to comply with these requirements, the liability limitation is unenforceable and the carrier is liable for the full value of the lost or damaged package. *Welliver v. Fed. Express Corp.* (S.D.N.Y.1990), 737 F.Supp. 205, 208. The reasonableness of the carrier's notice to its shippers "is a question of law to be determined by the court." *Id.* at 207, citing *Deiro v. Am. Airlines, Inc.* (C.A.9, 1987), 816 F.2d 1360, 1364.

■ Here, paragraph one of Delta's waybill permits the shipper to declare a value up to $750 for domestic flights. Bill Winfrey, Delta's coordinator for Consumer Affairs Baggage and Cargo Litigation, stated by affidavit that Delta provides no insurance to cover the shipper for packages Delta Dash delivers; that Delta Dash would refuse to deliver any package with an indicated value in excess of $750; and that the shipper would be advised to ship by a regular Delta delivery service if the value of the package exceeds $750. (Winfrey Affidavit, January 17, 1996.) However, neither the waybill nor the "Official Local Cargo Rules Tariff (No. 84)," incorporated into the waybill, states that shipments with a declared value in excess of $750 are not acceptable for transportation under the Delta Dash service. Although Tariff Rule G32, entitled "Limit of Liability," and Rule G52, entitled "Charges for Declared Value," suggest varying rates depending on the declared value of the shipment, neither references the Delta Dash service, its $750 declared value limit for that service, or the alternative service under Delta Air Cargo for more valuable shipments. Thus, even though the rules address the availability of insurance, they failed to provide plaintiff adequate notice of his shipment options.

■ Although air carriers are not required to orally explain the shipper's options, the air shipment contract must provide the shipper with reasonable notice of the option to declare a higher value, "pay an additional fee, and thereby be insured at a higher rate should the shipment go awry." *Husman Constr. Co. v. Purolator Courier Corp.* (C.A.8, 1987), 832 F.2d 459, 461; see, also, *Hill Constr. Corp., supra,* 996 F.2d at 1318 (implying that oral notice of these options might have been required if the context had been noncommercial). Because Delta purports to limit the value of shipments shipped through Delta Dash to $750, the released value doctrine requires Delta to reasonably inform plaintiff not only that shipments valued in excess of $750 are inappropriate for Delta Dash but that Delta maintains a general cargo delivery service that allows shippers to ship and insure packages valued in excess of $750. Because the waybill and its governing tariffs fail to provide such reasonable notice, Delta's liability limitation provisions are unenforceable under the released value doctrine.

Defendant nonetheless relies heavily on *First Pennsylvania Bank,* where Eastern Airlines, Inc. operated SPRINT, an air shipment service with a declared value limit of $500. *First Pennsylvania Bank, supra,* 731 F.2d at 1115. The

shipper, a bank who on one hundred forty-seven prior occasions had shipped checks with SPRINT, elected to ship checks worth over $4 million through the SPRINT service. As on each prior shipment, the bank declared a $500 value on the waybill. The shipment was lost. While replacement checks enabled the bank to recover all but $12,932.12 of the funds, the bank brought a lawsuit against Eastern for the unrecovered amount. As in the present case, no Eastern employee orally disclosed to the bank its alternate air freight service permitting higher valuation at a higher rate. Nor did Eastern show the bank its tariffs or suggest that the bank consult the tariffs to become aware of the options available for transporting valuable items. *Id.*

Despite the factual similarities *First Pennsylvania Bank* shares with the present case, four important facts distinguish it from this case. Initially, although an Eastern representative made it clear to the bank that the SPRINT service was available only for shipments having a value of $500 or less, the bank knowingly ignored this restriction by declaring a $500 value for shipments having a greater value. *Id.* Here, defendant failed to inform plaintiff that Delta Dash was available only for shipments with an indicated value of $750 or less. Second, Eastern's tariffs governing shipments through SPRINT expressly set forth the limitations of the SPRINT service, stating: "Shipments with a declared value in excess of $500 are not acceptable for transportation under this tariff." *Id.* By contrast, defendant's tariffs do not reference even the Delta Dash service. Third, and most significantly, the bank was able to identify its insurance options because Eastern's tariffs discussed both the SPRINT service and Eastern's alternate air freight service, which permitted shippers to pay higher rates to insure packages valued above $500. Here, the waybill and tariffs fail to reasonably communicate the available options to plaintiff. Last, the bank was a sophisticated commercial entity that had utilized Eastern's SPRINT service on one hundred forty-seven prior occasions, in contrast to plaintiff, an individual shipping a gift to a noncommercial recipient.

■ Defendant also relies on plaintiff's failure to declare a value at the time of shipment. Plaintiff's omission is not dispositive, given the insufficient notice defendant provided in its liability limitation provisions. A shipper's failure to declare a value is relevant when the carrier reasonably communicates the shipper's option to declare a higher value, pay a greater fee, and thereby purchase increased coverage. *Hill Constr., supra,* 996 F.2d at 1317–1318; *Husman Constr., supra,* 832 F.2d at 461. Because defendant failed in those requirements, the limitation provisions are unenforceable despite plaintiff's failure to declare a value. *Welliver, supra,* 737 F.Supp. at 207–208.

Moreover, on the undisputed evidence in this case, even if plaintiff had written the full value of the watch in the declared value block, Gerry Thompson, the

Delta employee who processed the transaction, would not have been able to instruct plaintiff on his options. Thompson stated that he did not know whether defendant charged different rates depending on "insurance" or whether the Delta Dash service even offered insurance. Indeed, he had never looked at the backside of the air waybill.

Given the foregoing, defendant's liability limitation provisions are unenforceable, and defendant is liable to plaintiff for the full value of the watch plaintiff shipped with Delta Dash.

■ Although plaintiff also seeks consequential damages, his claim is precluded under the specific terms of his agreement with defendant. Paragraph six of the air waybill expressly disclaims defendant's liability for any consequential or special damages incurred by a shipper. Because this provision is independent from the released value provisions, plaintiff is barred from recovering consequential damages. *Husman Constr., supra,* 832 F.2d at 462 ("Any challenge to [the carrier's] limitation of liability under the released value doctrine could not serve to invalidate the contract between [the shipper] and [the carrier] on the issue of consequential damages.").

Given the foregoing, plaintiff's first and second assignments of error are sustained regarding the trial court's decision limiting defendant's liability to $102.56, and overruled regarding plaintiff's claim for consequential damages; as a result, his third assignment of error is moot. App.R. 12(A). Accordingly, we reverse the judgment of the trial court and remand with instructions to enter judgment in favor of the plaintiff for the full value of the lost watch.

*Judgment reversed and cause
remanded with instructions.*

DESHLER and LAZARUS, JJ., concur.